UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEAN BRADY, | |
| Plaintiff, | |
| -against- | **COMPLAINT** |
| NEW YORK CITY DEPARTMENT OF EDUCATION; MATTHEW TOSSMAN, former Principal of Manhattan Early College for Advertising ("MECA"), THOMAS WIERZBOWSKI, Assistant Principal of MECA; JEREMY DANIEL, former Athletic Director of Murry Bergtraum High School; PEDRO DONES, teacher at MECA, and ALEX RIVERA, Dean of Murry Bergtraum High School, | **ECF CASE**<br><br>20 Civ. ____<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff SEAN (Summer) BRADY, by her attorneys, GLASS HARLOW & HOGROGIAN LLP, as and for her Complaint against Defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff is a high school teacher presently employed by Defendant New York City Department of Education in Manhattan, and brings this action for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et. seq.*; the New York State Human Rights Law, N.Y. Exec Law § 296 ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Administrative Code §§ 8-101 *et. seq.* ("NYCHRL"), based on discrimination due to her disability and gender, as well as retaliation after she made protected complaints of discrimination concerning gender discriminatory comments, treatment, and behavior towards her, and the lack of reasonable accommodations provided by Defendants for her disability.

2.      Plaintiff seeks economic, compensatory damages and punitive damages to the extent allowable by law, and other appropriate legal and equitable relief under federal, state, and city law.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 as this matter involves federal questions.

4.      This action's venue properly lies in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391, because the headquarters of the New York City Department of Education is located at 52 Chambers Street, New York, NY 10007, and the relevant facts herein occurred in Manhattan.

5.      This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6.      This Court has supplemental jurisdiction over Plaintiff's state and city law claims under 28 U.S.C. § 1367(a).

7.      Plaintiff filed a discrimination charge with the U.S. Equal Employment Opportunity Commission ("EEOC"), on or about May 11, 2017.   Plaintiff thereafter received a probable cause finding for discrimination on or about September 2019, annexed hereto as Exhibit A.

8.      Plaintiff thereafter received a Notice of Right to Sue letter from the EEOC, dated September 2, 2020, which is annexed hereto as Exhibit B.

**PARTIES**

9.      Ms. Sean (Summer) Brady is a resident of the County of Nassau and the State of New York.

10.     At all times relevant herein, Ms. Brady was an "eligible employee" as defined by 42 U.S.C. § 12111.

11.     Ms. Brady is a transgender female.  Prior to August 2015, she presented herself as a male at work in the NYCDOE.

12.     The NYCDOE has been aware since on or about August 2015 that Ms. Brady was in a gender transition process.

13.     Ms. Brady is disabled with transgender dysphoria, which is defined as a medical condition related to an individual having a gender identity different from the sex assigned to him or her at birth.

14.     At all times relevant herein, Defendant NEW YORK CITY DEPARTMENT OF EDUCATION ("NYCDOE") is a city school district established pursuant to Title II, Article-52-A of the New York State Education Law, NY Educ. Law Section 2590 *et seq*, and an "employer" as defined by 42 U.S.C. § 12111.

15.     At all times relevant herein, Defendant NYCDOE was Ms. Brady's employer within the meaning of all applicable statutes.

16.     At all times relevant herein, Defendant MATTHEW TOSSMAN was Principal of Manhattan Early College for Advertising ("MECA") within the NYCDOE and is sued in his official and individual capacity.  His gender identification is male.  He had the authority to and did hire and fire employees, as well as supervise and control employees' conditions of employment.  Principal Tossman is an employer within the meaning of New York Executive Law

296 (1). Tossman exercised managerial and supervisory authority within the meaning of the New York City Human Rights Law section 8-107.

17.     At all times relevant herein, Defendant THOMAS WIERZBOWKSI was an Assistant Principal of MECA within the NYCDOE and is sued in his official and individual capacity. His gender identification is male. He had the authority to and did hire and fire employees, as well as supervise and control employee conditions of employment. Assistant Principal Wierzbowksi is an employer within the meaning of New York Executive Law 296 (1). He exercised managerial and supervisory authority within the meaning of the New York City Human Rights Law section 8-107.

18.     At all times relevant herein, Defendant PEDRO DONES was a teacher at MECA within the NYCDOE and is sued in his official and individual capacity. His gender identification is male.

19.     At all times relevant herein, Defendant ALEX RIVERA was a Dean at the Murry Bergtraum High School  ("Bergtraum") within the NYCDOE and is sued in his official and individual capacity. His gender identification is male.

20. At all times relevant herein, Defendant JEREMY DANIEL was the Athletic Director of Murry Bergtraum High School  ("Bergtraum") within the NYCDOE and is sued in his official and individual capacity. His gender identification is male.

## STATEMENT OF FACTS

21.     Ms. Brady began her employment with Defendant NYCDOE in February 2012 through June 2012 at Automotive High School as a licensed special education teacher. She is a certified guidance counselor, social studies teacher, and a special education teacher. She then was hired at Life Academy in Bensonhurst, Brooklyn in September 2012 through June 2013. She then

transferred through the NYCDOE's open market to John Dewey High School in September 2013 until June 2015, and then transferred to Queens United Middle School in September 2015 until April 2016. In April 2016, she started working at Manhattan Early College for Advertising School (MECA) within the Murry Bergtraum High School campus in Manhattan. She continues to be employed by the NYCDOE as a special education teacher to date at Maker High School in Manhattan. Upon information and belief, guidance counselor positions receive higher salaries than teachers under the UFT-DOE contract, have higher per session hourly rates, and have more per session opportunities available to them.

**2015-16 School Year**

22.     After suffering severe and pervasive harassment as a transgender female at Queens United Middle School during the 2015-2016 school year, in April of 2016, Ms. Brady accepted a new position teaching at MECA as an Absent Teacher Reserve teacher as part of a settlement agreement with the NYCDOE's Office of Equal Employment Opportunity (OEO). Ms. Brady was eager for a fresh start with the NYCDOE and to start a position at a new school where she could be her authentic self and teach as a woman.

23.     Principal Matthew Tossman was principal of MECA high school when Ms. Brady was assigned to MECA by the NYCDOE.

24.     In April 2016, Ms. Brady arrived at MECA and was essentially assigned babysitting classes for her schedule at MECA for classes that no other teachers wanted. Ms. Brady openly identified herself as a transgender female when she arrived at MECA and was allowed to teach as Ms Brady for the first time.

25.    In April 2016, upon her arrival at the school, Ms. Brady learned about an open guidance counselor position at the school, and asked Principal Tossman if he would hire Ms. Brady for a guidance counselor position.

26.    Principal Tossman paid lip service to Ms. Brady's request.  In May 2016, Ms. Brady was set up to interview with Stephanie Gilman, an outside social worker consulting for CUNY, who Ms. Brady later learned was not a decision maker.  In contrast, the individual who was offered the guidance counselor position (a cisgender female) interviewed with numerous people, including administration and the hiring committee. In short, Ms. Brady, a transgender employee who had previously complained about past discriminatory conduct, was not given equal opportunity to seek or fair consideration for a position for which she was well qualified.

27.    After Ms. Brady was "interviewed" for the guidance counselor position which was posted on the open market, Principal Tossman informed Ms. Brady that the school was going to hire a social worker instead of a Guidance Counselor and to ignore the posting on the open market because of budgetary concerns.  Principal Tossman informed Ms. Brady that the school was going to push to hire Ms. Brady as the school's second guidance counselor.

28.    In June 2016, Principal Tossman told Ms. Brady that he would hire Ms. Brady for the next available guidance counselor or teacher position for next year if the budget was available.

**2016-17 School Year**

29.    Ms. Brady called Principal Tossman over the summer of 2016 to find out if there was an open position as a guidance counselor or teacher position for the 2016-2017 school year.

30.     Ms. Brady was not assigned a permanent position, but was placed back in the school as an ATR.  Despite Principal Tossman's assurances that Ms. Brady would be hired for the next available position, upon returning to MECA for the 2016-2017 school year, Ms. Brady

learned that another person was hired as a guidance counselor position instead of her, as well as multiple special education and social studies teachers (all cisgender individuals).

31.     In the 2016-2017 school year, while other teachers were given classrooms, Ms. Brady was hidden away and forced to teach her class of 45 students in the broken-down and decrepit school library.  There was no working phone in the library and no other way to communicate with anyone outside of the library.  In fact, conditions were so objectively bad, that on one occasion in the fall of 2016, a student who Ms. Brady counseled told Ms. Brady that MECA treated her like the "Hunchback of Notre Dame."  Ms. Brady was given a hybrid schedule with random classes instead of a full teaching schedule.

32.     When Ms. Brady returned to MECA for the 2016-17 school year, there was a new female restroom available to all female staff, each who had a key to this locked restroom.   Ms. Brady was not provided a key to this restroom even after requesting one.  Ms. Brady also was assigned a schedule that did not include a lunch period to allow her to eat or take a break.

33.     On November 14, 2016, Ms. Brady requested her union UFT chapter Leader Alvis Wilson schedule an urgent meeting with Principal Tossman.

34.     On November 15, 2016, Ms. Brady, Principal Tossman and UFT Chapter Leader Alvis Wilson met.  At the meeting, Ms. Brady advised Principal Tossman that she had no working phone in her classroom, which made her feel unsafe because she was frequently berated and threatened by students for simply being transgender.  She also advised Principal Tossman that the students were using the wrong pronoun to address her.  Ms. Brady further advised Principal Tossman that a male student who had physically assaulted her on a previous occasion was allowed to come into her classroom and attack her again, after Ms. Brady had been advised by the school that the student would not be allowed into the classroom.

7

35.     Ms. Brady reported to Principal Tossman that many of the LGBT students were being bullied by other students and that the bullying students were not punished for it.  Ms. Brady expressed her concern that teachers were not reporting the incidents.  Ms. Brady herself also reported multiple incidents of a transgender student being bullied. Upon information and belief, Principal Tossman did not do anything with the information that was provided to him.

36.     At the same meeting on November 15, 2016, Ms. Brady once again verbally requested that  Principal Tossman grant her access to the female staff restroom or any private locked restroom due to her transgender status and her disability.  However, Ms. Brady was not granted access to any restroom until April 2017, five months after the request was made.

37.     Among the various babysitting classes Ms. Brady was assigned to teach during the 2016-2017 school year, Ms. Brady was assigned to teach the Spanish computer program although Ms. Brady did not speak Spanish.  On December 1, 2016, Ms. Brady spoke with Assistant Principal Thomas Wierzbowski expressing her concern that her students would fail the Spanish computer program and that it could adversely affect her ratings.   AP Wierzbowski advised Ms. Brady that he understood her concerns and she would not need to grade the class since the beginning of the year.  Ms. Brady did not receive the curriculum for this class until more than a month after school started.  Ms. Brady also advised AP Wierzbowski that three of the students in the class had previously physically harmed her due to her sexuality and transgender status and requested they be removed.  However, AP Wierzbowski did not remove the students from Ms. Brady's class despite her request.

38.     On December 2, 2016, Ms. Brady met with Guidance Counselors Jeanetee Tourella and Lourdes Figueroa. At this meeting, both guidance counselors informed her that they had a positive conversation with Principal Tossman regarding her.  The Guidance Counselors

8

informed Ms. Brady that they advised Principal Tossman that they needed her at the school and as a counselor.  The Guidance Counselors advised Ms. Brady that Principal Tossman stated that he was well aware of the "shit show" that Ms. Brady inherited and that she was doing things for the school that no one else would.

39.    On December 2, 2016, Principal Tossman advised Ms. Brady that he wanted to see if he could hire her as a guidance counselor as soon as possible and that he was going to reach out to his HR Budget Director Carl Giaimo to see whether it was possible to hire her sooner rather than later.  Ms. Brady and Principal Tossman discussed her being a full time counselor as well.

40.    On December 6, 2016, Ms. Brady held a meeting with a student in her personal office in the school library.  Without warning, a student from Murry Bergtraum High School (which is located in the same building as MECA) entered her office and called Ms. Brady a "tranny."  Ms. Brady asked the student to leave. The student proceeded to approach Ms. Brady and grabbed her breasts. The student forcibly squeezed them and shoved Ms. Brady backwards with force.  The student then tried to block the doorway so that Ms. Brady could not leave her office.

41.    Because she had repeatedly requested and eventually received a radio from the administration, Ms. Brady was able to call school safety for help after receiving no response from her school administration when she radioed them for help.  The student was flailing his arms at Ms. Brady while saying things such as "This is between me and this Nigga".  School safety and Murry Bergtraum staff were able to escort the student to a separate location away from Ms. Brady.

42.    Shortly thereafter, Ms. Brady met with school safety and the NYPD and provided them with a statement of the incident.  Ms. Brady submitted a copy of her statement to Murry Bergtraum staff, as she was instructed to do so.

43.     Ms. Brady was advised by staff members, including Murry Bergtraum AP Bibiana Ammatuna, that the student admitted to attacking her because she was transgender.  Ms. Brady also was advised by staff members, including AP Ammatuna and Dean Alex Rivera, that the student had been inquiring about her gender status several weeks prior to the physical attack.

44.     Ms. Brady was advised by Murry Bergtraum staff that the student was supposed to have a 1:1 paraprofessional and that he was known to be aggressive towards females. Murry Bergtraum speech pathologist, Christina Rodriguez, tried to offer excuses to Ms. Brady regarding the student's aggressive behavior towards females and downplay the student's attack on her.

45.     Ms. Brady received a phone call from Naima Cook, Principal of Murry Bergtraum High School, who instructed Ms. Brady that there were some things she wanted Ms. Brady to add to her written statement.  She instructed Ms. Brady that she was sending "someone" shortly to add to the statement.  That "someone"  never came.

46.     Despite the trauma Ms. Brady had just experienced due to the student attack, Principal Tosssman instructed Ms. Brady to return to teaching for the last block of the day.

47.     After the school day had ended on December 6, 2016, Dean Alex Rivera asked to speak with Ms. Brady.  Ms. Brady was advised by Principal Tossman to meet with him.

48.     Present at the meeting were Ms. Brady, Dean Rivera, and an AP of Murry Bergtraum High School, Ms. Ammatuna. During the meeting, it was made clear that Murry Bergtraum High School administration was blaming Ms. Brady for the attack.  Dean Rivera stated that the attack would not have occurred if Ms. Brady was more open about her gender identity, This comment perplexed Ms. Brady as she is very open about her gender identity.  Ms. Brady presents herself as a woman, and at work in the school is known and addressed as Ms. Brady.

49.     Dean Rivera made degrading comments to Ms. Brady throughout the meeting. For example, he asked Ms. Brady, "What are you? I can't even tell myself anyway." After repeated invasive questions, Ms. Brady was forced to explain to him that although she was born a male, she has transitioned and she identifies as a trans-woman.  Despite this explanation, Dean Rivera continued to ask inappropriate questions about Ms. Brady's gender, and purposefully called Ms. Brady the wrong pronouns.  Dean Rivera asked Ms. Brady more than once if she had breasts.

50.     Furthermore, Dean Rivera tried to pressure Ms. Brady to revise her statement to make the students' action appear less aggressive.

51.     Following the meeting with Dean Rivera, Ms. Brady approached Principal Tossman and informed him of Dean Rivera's inappropriate behavior.  Ms. Brady  also  reported to him that she was disturbed at the way a NYPD detective had treated her on the phone, specifically that the detective wanted Ms. Brady to send him a selfie of herself.  Ms. Brady advised Principal Tossman that she was concerned that Dean Rivera was trying to blame Ms. Brady for the attack. Principal Tossman took no action.

52.     On December 7, 2016, Ms. Brady spoke with AP Ammatuna. During this conversation, AP Ammatuna advised Ms Brady that she went home and cried for Ms. Brady.  She explained that she felt that Ms. Brady was victimized twice, once by the student and again by Dean Rivera.  AP Ammatuna thought it was disgusting the way Dean Rivera had acted toward Ms. Brady.  AP Ammatuna explained that Dean Rivera knew Ms. Brady's  identified gender.

53.     On December 7, 2016, Ms. Brady met with Principal Tossman and reported on the meeting with Dean Rivera, and the severe humiliation and distress it had caused her.  Principal Tossman advised Ms. Brady that he would look into how best to handle it.  Principal Tossman

strongly discouraged Ms. Brady from reporting Dean Rivera to Principal Cook of the Murry Bergtraum High School.

54.     On December 8, 2016, Principal Tossman called Ms. Brady into his office and informed Ms. Brady that the media had picked up the story.  Principal Tossman advised her to be prepared to possibly have her name in the media. This was very distressing to her as she was terrified that her name and home address would be released and was concerned for her safety and the safety of her significant other, due to possible retaliation for her gender identification.

55.     Principal Tossman shared with Ms. Brady that he himself was upset when he was in the media.  He advised Ms. Brady that the NYCDOE had not truly supported him until he pressured the NYCDOE into supporting him.   He advised Ms. Brady that with the assistance of his lawyer wife and a close family member that works for a large news station,  he was able to warn the NYCDOE that he would make a statement in front of the school building with television news vans present.

56.     At the end of the meeting, Principal Tossman discussed Ms. Brady's employment for next year and Ms. Brady's desire to be a full time guidance counselor at the school.

57.     On December 8, 2016, Principal Tossman and UFT District representative Alice O'Neil advised Ms. Brady that they had submitted her statements and UFT Chapter Leader Alvis Wilson's statement to the DOE's Office of Equal Employment Opportunity (OEO).   However, no one from OEO reached out to Ms. Brady regarding her complaint until over a month later.   It was later confirmed from multiple sources that the investigation was opened on December 9, 2016.

58.     On December 12, 2016, Ms. Brady sent an email to Superintendent Fred Walsh, Alice O'Neil and Alvis Wilson, requesting a meeting with the Superintendent regarding the

mishandling of many situations involving her administration, co-workers, and Murry Bergtraum staff regarding her transgender status. Ms. Brady requested that her administration not be made aware of the request as she feared retaliation.

59.     The Superintendent and Ms. O'Neil did not respond initially to Ms. Brady's request for a meeting with the Superintendent.  Ms. Brady attempted to schedule a meeting numerous times over a period of multiple months, but was never granted one.  She was advised that she needed to include Principal Tossman in the request.  Clearly, Principal Tossman was one of the perpetrators that she wanted to report.

60.     On December 12, 2016, Ms. Brady received an email from Dean Rivera with Principal Cook and Christina Rodriguez cc'd on it regarding a student discipline hearing about the student's attack on Ms. Brady.  The email stated  "Hearing date is 12/15/16 at 8:30 am. Let's meet here at 7:45 AM".

61.     Ms. Brady was stressed by this as she was being asked to meet with Dean Rivera, a man who had traumatized her.

62.     Over the next couple of days, Ms. Brady was continuously approached by the Bergtraum staff and cc'd on emails sent by Dean Rivera.  Dean Rivera, Principal Cook, and Christina Rodriguez all conspired to have Ms. Brady meet with them prior to the December 15, 2016 hearing.   Ms. Brady did not accept their offer.  Ms. Brady was asked several times prior to the hearing to go over her story.   Ms. Brady reported these pressure tactics to OSI, her Union, Principal Tossman, and the OEO.

63.     UFT District Representative Alice O'Neil informed Ms. Brady that she advised Principal Tossman via phone on December 13, 2016, that Ms. Brady should not be contacted by

the staff at Murry Bergtraum High School.  However, Dean Rivera continued to talk to Ms. Brady throughout the 2016-2017 school year.

64.     On December 15, 2016, Ms. Brady attended the student discipline hearing for the student who attacked her at an uptown Manhattan location. When Ms. Brady arrived at the location of the hearing, she learned that the hearing was cancelled. No one had informed Ms. Brady of the cancellation despite the staff of Murry Bergtraum being notified in advance of the cancellation.

65.     On December 15, 2016, Ms. Brady spoke with the MECA guidance counselors about the student discipline hearing being cancelled without notice to him.  Principal Tossman came into the guidance department and joined the conversation.  He claimed to have no knowledge that a hearing was even happening. After Principal Tossman left, Guidance Counselor Lourdes Figueroa stated that it was obvious Principal Tossman was lying.

66.     That same day, Ms. Brady was in the library having a conversation with a fellow teacher Loretta Kleinberg about the cancelled hearing.  Christina Rodriguez was also in the library and stated that she had learned that the hearing was cancelled from Dean Rivera.

67.     On December 16, 2016, guidance counselor Lourdes Figueroa disclosed that Ms. Brady's whole interview process last school year was staged at MECA.  She claimed that the administrators had been holding interviews while Ms. Brady was led to believe that they were not hiring a guidance counselor anymore because of the budget.  She stated that AP Wierzbowski never followed up on any of Ms. Brady's allegations.  She stated that the MECA school had hired multiple staff members in other positions that Ms. Brady was certified for.

68.     On December 18, 2016, while Ms. Brady's UFT chapter leader was out of the building, Principal Tossman advised Ms. Brady to meet with an ATR administrator named Arleen Liquori.

69.     When Ms. Brady arrived for the meeting, there was another ATR administrator present by the name of Lisa with Ms. Liquori.  During the meeting,  Dean Rivera walked by, which upon information and belief was done to harass and intimidate Ms. Brady.   These ATR administrators Lisa and Arleen Liquori interrogated Ms. Brady about her role as a guidance counselor, specifically her role in conducting mandated counseling.

70.     After the meeting, Ms. Brady reached out to her UFT chapter leader Alvis Wilson and advised Mr. Wilson of her concerns regarding the meeting and her fear of retaliation.

71.     On or about December 19, 2016, Principal Tosssman informed Ms. Brady that her schedule was being changed for the next semester.  Specifically, she was being removed from all duties as a guidance counselor.  This came as a great shock to Ms. Brady,  as in the past both the Guidance Department and Principal Tossman had repeatedly advised Ms. Brady that they wanted her to take on more responsibilities as a guidance counselor.  Principal Tossman reassigned Ms. Brady to a classroom with no guidance counselor duties.

72.     Ms. Brady advised Principal Tossman that she was promised the position last year. Principal Tossman blamed it on miscommunication.

73.     Ms. Brady inquired with Principal Tossman about him contacting his HR Budget Director Mr. Giaimo to hire her early for a permanent position.  He advised Ms. Brady that he had just contacted him over the weekend and that it was not happening.  Principal Tossman stated Ms. Brady was not an ATR and he could only hire ATRs.  When Ms. Brady clarified that she

believed she was an ATR, he claimed that he would see if he could then hire her if that was the case, but never followed up on this.

74.    In January 2017,  Ms. Brady met with a detective from the NYPD following up on the student who had attacked her.  The NYPD detective explained to Ms. Brady that he was having no luck getting any evidence from Ms. Brady's school.  In fact, he said he contacted Principal Tossman many times and even connected with him once.  Principal Tossman advised him he was very busy and would call him back but never did.

75.    On January 12, 2017, Ms. Brady met with Principal Tossman and inquired if anyone from the NYPD had tried contacting him.   He stated that "they called yesterday, I did not have any of the information he needed, he wanted to talk to level three."  Principal Tossman purposely withheld information from the NYPD and disposed of Ms. Brady's witness statement forms about the attack on her.

76.    In January 2017, Ms. Brady spoke to the NYCDOE's Office of Special Investigation (OSI) and the Office of Equal Employment Opportunity (OEO) office.  Ms. Brady was advised that all of the official NYCDOE statement forms that she had handed in on December 9, 2016 to Principal Tossman were missing, and that neither office had them in their possession. These statements were related to Ms. Brady's harassment and discrimination claims due to her transgender identity/expression and status as a transgender person.

77.    On January 10, 2017, an OSI investigator named Christina Bunch met Ms. Brady at her school with UFT union chapter leader Alvis Wilson present.

78.    Ms. Brady advised OSI investigator Bunch that she would like to meet with union representation.  Ms. Bunch provided Ms. Brady with her business card and a letter.  The letter was made out to "Mr. Brady",  despite Ms. Brady's known transgender status.

79.     On January 17, 2017, Ms. Brady requested that there be a substitute for her class in order to attend her OSI meeting.  Principal Tossman advised her to have one of the guidance counselors provide coverage.  Ms. Brady requested the Guidance Department to have a counselor provide coverage for her.   However, no one appeared to cover her class, which led to her being late for her OSI meeting.

80.     At Ms. Brady's OSI meeting with Christina Bunch, Ms. Bunch advised her that she only had some written statement form.  In fact, the form only related to the incident with the student. The statement had nothing to do with Dean Rivera.  Ms. Brady advised Ms. Bunch verbally of what forms were missing and what they stated.  Ms. Brady reported to Ms. Bunch that she was being retaliated against by her administration for her claim.  Neither Ms. Bunch nor OSI contacted him again after this meeting with Ms. Bunch.

81.     On February 28, 2017, Principal Tossman came to Ms. Brady's office area with two ATR administrators talking about how they were planning to structure the rooms in the suite for four guidance counselors (including two new guidance counselors for the school).

82.     Ms. Brady inquired with Guidance Counselor Jeanette Tourella about this conversation and she confirmed that Principal Tossman was hiring four guidance counselors.

83.     On March 28, 2017, guidance counselors Lourdes Figueroa and Jeanette Tourella came to Ms. Brady's office and started talking about how they are going to decorate Ms. Brady's office which was being turned into the counseling suite for the next year. They spoke about how they were going to be hiring two new counselors next year.  They made it clear that Principal Tossman planned on hiring two new guidance counselors other than Ms. Brady.

84.     On March 30, 2017, Ms. Brady met with Principal Tossman to get clarification about the guidance positions that she had heard about.  Principal Tossman stated, "We are in the

process right now of trying to figure out what our counseling program looks like both for next year and for when our school is at our full capacity. Let me keep working on that kind of like sketch and then let me show that to you and see what and then let's continue the conversation like as we flesh it out a little more but that work is happening now and I could be done pretty quickly." However, Principal Tossman never followed up with Ms. Brady despite them already starting the interview process for the position.

85.     On April 3, 2017, Ms. Brady sent another email asking to meet with UFT District Representative Alice O'Neil, the Superintendent, and Alvis Wilson.  In this email, Ms. Brady again stated if need be she would cc Principal Tossman on the email.

86.     Ms. O'Neil contacted Ms. Brady via Alvis Wilson's cell phone to discuss the April 3, 2017, email, and Ms. Brady advised her of the way the investigations had been handled.  Ms. O'Neil brushed aside Ms. Brady's concerns.

87.     Ms. Brady advised Ms. O'Neal that she still did not have access to the female staff restroom, a year after she had been transferred to the school.   Ms. Brady reminded Ms. O'Neal that she had asked repeatedly of Principal Tossman and Alvis Wilson for a key to the ladies room and had not received one.

88.     On April 4, 2017,  Ms. Brady was approached by fellow teacher Pedro Dones at an  after school program involving parents and students. He asked Ms. Brady invasive questions about her gender and sexuality, and claimed not to know what gender Ms. Brady identified with.

89.     Mr. Dones admitted to Ms. Brady that he mistreated a transgender student as well as advised her that he had been discussing her transgender status with his class.  He admitted that he had advised his students to ask Ms. Brady "What gender are you?", which caused students to be  uncomfortable in Ms. Brady's class.

90.     On April 5, 2017, Ms. Brady reported the above incident to Principal Tossman. During the meeting, Principal Tossman  claimed not to know how to handle this situation.

91.     On April 6, 2017, Principal Tossman advised Ms. Brady that he could not get the answers on how to proceed with her complaint.  He stated that 99 percent of the time in situations like this, these investigations get bounced back to him.

92.     On April 7, 2017,  Principal Tossman advised Ms. Brady that he still did not have an answer on how to proceed and requested written statements from Ms. Brady regarding the incident.

93.     On April 8, 2017, Ms. Brady submitted to Principal Tossman and OEO a written statement of the April 4, 2017 incident with Pedro Dones.

94.     On April 24, 2017, Ms. Brady viewed that the school secretary had on her desk a folder with every job posted on the open market.   Ms. Brady inquired with the secretary about the guidance position and was advised that she was not aware of any.   However, online two positions were posted.

95.     On May 5, 2017,  Principal Tossman in the presence of Pedro Dones smiled at Ms. Brady and called her sir.

96.     On May 5, 2017, Ms. Brady applied on the open market for the guidance counselor listing for her then current school, MECA.

97.     On May 5, 2017,  Ms. Brady met with investigator Sarah Marx from OEO.  Ms. Marx could not answer why her statements that were submitted to Principal Tossman on December 8, 2016, were missing.

98.     Ms. Marx, who is employed as an OEO investigator by the City of New York, questioned Ms. Brady extensively on why Ms. Brady considered herself disabled.  Ms. Brady

advised Ms. Marx that pursuant to New York State Human Rights Law, transgender dysphoria is a disability.  Ms. Marx did not allow Ms. Brady to file any additional reports regarding the harassment, bullying, and retaliation that she had suffered at MECA.

99.     During Ms. Brady's employment at MECA, students frequently used anti-transgender epithets and homophobic comments when speaking with or about her.  The administration did not do anything to address this situation.  No student was reprimanded for their misbehavior.

100.     Throughout Ms. Brady's employment at MECA, she was physically and verbally attacked by students.  She was shoved, fondled, groped, grabbed by her hair and students yelled into her face.   No student was reprimanded for their misbehavior.

101.     As a result of Defendants' discriminatory and retaliatory actions, Ms. Brady has suffered physical harm, emotional damages, and psychological distress.

102.     On or about May 11, 2017, Ms. Brady filed a protected complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging gender discrimination and retaliation.

103.     Ms. Brady applied for additional teaching positions at MECA but was not offered a permanent position for the 2017-18 school year.

104.     Ms. Brady inquired about a position at another school within the Murry Bergtraum campus, called Urban Assembly Maker Academy ("Maker"), and was hired as a special education teacher effective September 2017, and removed from the ATR pool.

105.     In April 2017, Ms. Brady inquired about a coaching position with the Murry Bergtraum athletic director, Jeremy Daniel.  He told Ms. Brady there were no open positions and deliberately called her "Mr. Brady" in front of multiple individuals.  Principal Tossman then told

Ms. Brady the next day that there were in fact open coaching positions at MECA, contrary to Daniel's representation.

### 2017-18 School Year

106.     In the 2017-18 school year, Ms. Brady was given the table tennis and badminton coaching positions only after the then coach was unable to coach.  The athletic director Mr. Daniel continued to repeatedly degrade Ms. Brady's transgender status and repeatedly referred her verbally as Sean, knowing that she was known in the school as Summer.

107.     Mr. Daniel caused Ms. Brady to lose at least three PSAL coaching positions (soccer, table tennis, badminton) in the 2018-19 school year at the Murry Bergtraum campus.  Ms. Brady also was not paid for time running an afterschool music production program during the 2019-20 school year at the Murry Bergtraum campus.

108.     On or about September 2019, Ms. Brady received a determination from the EEOC finding reasonable cause for discrimination based on her sex (female) and retaliation due to her internal complaints, a copy which is annexed hereto as Exhibit A.

109.     On September 2, 2020, Ms. Brady received an EEOC right to sue letter after voluntary conciliation was unsuccessful, a copy which is annexed hereto as Exhibit B.

### FIRST CAUSE OF ACTION
**Against Defendant NYCDOE for Violation of Title VII, the New York State Human Rights Law and New York City Human Rights Law – Gender Discrimination**

110.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

111.     Plaintiff is a member of a protected class (transgender female).

112.     Plaintiff is qualified for her job and performing satisfactorily.

113.    Plaintiff suffered adverse employment actions, including but not limited to, being denied various permanent positions she was qualified to fill.

114.    Plaintiff's transgender status was a motivating factor in Defendants' adverse actions against Plaintiff.

115.    Plaintiff was treated less well than cisgender employees.

116.    As a proximate result of Defendants' discrimination, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, harm to her professional reputation, mental anguish, embarrassment, humiliation, and other incidental and consequential damages, attorneys' fees, costs and interest as permitted by the law.

117.    Defendants discriminated against Plaintiff by engaging in willful, wanton, and/or reckless conduct and/or in conscious disregard of Plaintiff's rights and Plaintiff is therefore entitled to damages under each statute, as well as an award of punitive damages as against Defendants under the New York State Human Rights Law and New York City Human Rights Law.

**SECOND CAUSE OF ACTION**
**(Against Defendant NYCDOE for Violation of Title VII, the New York State Human Rights Law and New York City Human Rights Law – Gender Based Harassment/Hostile Work Environment)**

118.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

119.    Plaintiff is a member of a protected class (transgender female).

120.    Defendants harassed Plaintiff based on her transgender status.  Plaintiff raised gender-identity specific issues to the NYCDOE, and repeatedly complained that she was subjected to discrimination and harassment.  The NYCDOE knew that Plaintiff was being harassed, but did nothing to address it.

121.     Defendants did not treat cisgender employees in the same manner.

122.     Defendants treated Plaintiff less well than her cisgender colleagues because Plaintiff is transgender and complained about discrimination.

123.     Defendants treatment of Plaintiff created a hostile work environment. Defendants conduct was severe and/or pervasive and altered the terms and conditions of Plaintiff's employment.  Plaintiff perceived her working environment to be hostile, as would a reasonable person in Plaintiff's shoes.

124.     The NYCDOE is liable for the harassment perpetrated on Plaintiff because it knew of such harassment and failed to take remedial action.  Among other things, they failed to take preventive and corrective measures to address the harassment of Plaintiff.

125.     As a proximate result of Defendants' discrimination, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, harm to her professional reputation, mental anguish, embarrassment, humiliation, and other incidental and consequential damages, attorneys' fees, costs and interest as permitted by the law.

126.     Defendants' conduct was engaged in with malice or reckless disregard for Plaintiff's rights, and Plaintiff is therefore entitled to an award of punitive damages as against Defendants under each statute, as well as under the New York State Human Rights Law and New York City Human Rights Law.

**THIRD CAUSE OF ACTION**
**(Against Defendant NYCDOE for Violation of Title VII, the New York State Human Rights Law and New York City Human Rights Law – Retaliation)**

127.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

128. Plaintiff engaged in protected activity by, *inter alia*, complaining to various principals and offices within the NYCDOE about the transgender based discrimination and harassment she experienced, as well as filing a charge of discrimination with the EEOC.

129. Because of Plaintiff's protected activity, Defendants took adverse employment actions against her as set forth hereinabove.

130. As a proximate result of Defendants' discrimination, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, harm to her professional reputation, mental anguish, embarrassment, humiliation, and other incidental and consequential damages, attorneys' fees, costs and interest as permitted by the law.

131. Defendants' conduct was engaged in with malice or reckless disregard for Plaintiff's rights, and Plaintiff is therefore entitled to damages under each statute, as well as an award of punitive damages as against Defendants under the New York State Human Rights Law and New York City Human Rights Law.

## FOURTH CAUSE OF ACTION
### (Against Individual Defendants Tossman, Wierzbowksi, Daniels, Dones and Rivera for Violation the New York State Human Rights Law and New York City Human Rights Law – Aiding and Abetting Discrimination)

132. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

133. Individual Defendants Tossman, Wierzbowksi, and Rivera were Plaintiff's employer within the meaning of the New York State Human Rights Law and New York City Human Rights Law. Among other things, Tossman, Wierzbowksi, and Rivera had the authority to hire and fire employees. Tossman, Wierzbowksi, Dones and Rivera aided, abetted, incited, condoned, encouraged, coerced and/or compelled the NYCDOE's gender discrimination against Plaintiff as more fully set forth above.

134.   As a proximate result of Tossman, Wierzbowksi, Dones and Rivera's aforementioned discrimination, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, harm to her professional reputation, mental anguish, embarrassment, humiliation, and other incidental and consequential damages, attorneys' fees, costs and interest as permitted by the law.

135.   Tossman, Wierzbowksi, Dones and Rivera's conduct was engaged in with malice or reckless disregard for Plaintiff's rights, and Plaintiff is therefore entitled to an award of punitive damages as against Defendants under the New York State Human Rights Law and New York City Human Rights Law.

### FIFTH  CAUSE OF ACTION
**(Against Defendants Tossman, Wierzbowksi, Daniels, Dones, and Rivera for Violation of New York State Human Rights Law - Aiding and Abetting Gender Based Harassment)**

136.   Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

137.   Individual Defendants Tossman, Wierzbowksi, and Rivera were Plaintiff's employer within the meaning of the New York State Human Rights Law and New York City Human Rights Law.  Among other things, Tossman, Wierzbowksi and Rivera had the authority to hire and fire employees.  Tossman, Wierzbowksi, and Rivera aided, abetted, incited, condoned, encouraged, coerced and/or compelled the NYCDOE's gender harassment against Plaintiff as more fully set forth above.

138.   As a proximate result of Tossman, Wierzbowksi, Dones and Rivera's aforementioned harassment, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, harm to her professional reputation, mental anguish,

embarrassment, humiliation, and other incidental and consequential damages, attorneys' fees, costs and interest as permitted by the law.

139.    Tossman, Wierzbowski, Dones and Rivera's conduct was engaged in with malice or reckless disregard for Plaintiff's rights, and Plaintiff is therefore entitled to an award of punitive damages as against Defendants under the New York State Human Rights Law and New York City Human Rights Law.

**SIXTH  CAUSE OF ACTION**
**(Against Defendants Tossman, Wierzbowksi, Daniels, Dones, and Rivera for Violation of New York State Human Rights Law - Aiding and Abetting Retaliation)**

140.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

141.    Individual Defendants Tossman, Wierzbowksi, and Rivera were Plaintiff's employer within the meaning of the New York State Human Rights Law and New York City Human Rights Law.  Among other things, Tossman, Wierzbowksi, and Rivera had the authority to hire and fire employees.  Tossman, Wierzbowksi, and Rivera aided, abetted, incited, condoned, encouraged, coerced and/or compelled the NYCDOE's retaliation against Plaintiff as more fully set forth above.

142.    As a proximate result of Tossman, Wierzbowksi, Dones, and Rivera's aforementioned retaliation, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, harm to her professional reputation, mental anguish, embarrassment, humiliation, and other incidental and consequential damages, attorneys' fees, costs and interest as permitted by the law.

143.    Tossman, Wierzbowksi, Dones and Rivera's conduct was engaged in with malice or reckless disregard for Plaintiff's rights, and Plaintiff is therefore entitled to an award of punitive

damages as against Defendants under the New York State Human Rights Law and New York City Human Rights Law.

## JURY DEMAND

Plaintiff hereby demands a trial by Jury.

## PRAYER/DEMAND FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor against Defendants as follows:

a.   Judgment declaring that Defendants acts violated Plaintiff's rights as secured by federal, state and city law prohibiting discrimination and retaliation in employment;

b.   Enjoining defendants from any further acts adversely affecting the terms and conditions of Plaintiff's employment including her compensation and privileges;

c.   Compensatory damages to compensate Plaintiff for economic loss, damage to name, profession, career and reputation, pain and suffering, emotional distress and mental anguish, embarrassment, indignity, and dislocation, in an amount to be determined at trial;

d.   Punitive damages against all Defendants;

e.   Statutory attorneys' fees, interest, costs, and disbursements, and

f.   For such other and further legal, equitable or other relief as the Court deems just and proper.

DATED:     New York, New York
                 December 1, 2020

                                       GLASS HARLOW & HOGROGIAN LLP
                                       One Blue Hill Plaza, Suite 1509
                                       Pearl River, NY 10965
                                       (212) 537-6859

                  By:    *s/ Bryan Glass*
                             Bryan D. Glass, Esq.